# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

_____

JEREMY MASHEK,

        Plaintiff,


v.                                    **MEMORANDUM OF LAW & ORDER**
                                      Civil File No. 11-487 (MJD/JJG)


SOO LINE RAILROAD COMPANY,
d/b/a CANADIAN PACIFIC,

        Defendant.

_____

M. William O'Brien, Timothy J. Louris, Miller O'Brien Jensen P.A., Counsel for Plaintiff.

Daniel Oberdorfer, Tracey Holmes Donesky, Amy B. Conway, Leonard, Street, and Deinard, Counsel for Defendant.

_____


## I.    INTRODUCTION

This matter is before the Court on Defendant's Motion for Summary Judgment.  [Docket No. 42]  The Court heard oral argument on October 12, 2012. Because Plaintiff cannot show that he was qualified for the locomotive engineer position during the relevant timeframe, the Court grants Defendant's summary judgment motion.

1

## II.  BACKGROUND

### A.  Factual Background

#### 1.  The Parties

Defendant Soo Line Railroad Company d/b/a Canadian Pacific ("CP")

hired Plaintiff Jeremy Mashek ("Mashek") in 2002.  Mashek began working at CP

as a locomotive conductor.  In August 2004, CP promoted Mashek to the

locomotive engineer position.  Mashek currently holds a locomotive engineer

position at CP.

#### 2.  The Locomotive Engineer Position

The locomotive engineer position is defined by the Federal Railroad

Administration ("FRA") regulations and is classified as a "safety-sensitive" or

"safety-critical" position.  Safety-sensitive positions involve functions that affect

railway safety and require quick responses in emergency situations.  In order to

become a locomotive engineer, Mashek participated in a 26-week training

program required by the FRA, which included classroom training, on-the-job

training, and written examinations.  During his tenure with CP, Mashek has an

accident-free employment record.

The terms and conditions of employment for locomotive engineers at CP is governed by the collective bargaining agreement between CP and the Brotherhood of Locomotive Engineers and Trainmen ("CBA"). The CBA includes a provision governing the seniority of locomotive engineers. Locomotive engineers with more seniority receive preference in choosing work assignments and schedules. Seniority is also valuable because, in the event of a reduction in force, locomotive engineers with higher seniority are more likely to retain their positions.

Mashek testified that the primary duties of a locomotive engineer require "safe movement of the train from point A to point B; adhering to rules and procedures; train handling procedures; communication with the conductor; [and] communication with the dispatchers." Locomotive engineers watch for signals by the side of the tracks, which alert them about whether to proceed, stop, be prepared to stop at the next light, or be prepared to take a siding. The trains that Mashek typically operates are 2,000-8,000 feet long and include between 30 and 120 individual cars. The trains weigh 2,000-16,000 tons, and carry materials including coal, grain, sulfur, fertilizer, gasoline, and anhydrous ammonia. The trains travel at speeds up to 60 miles per hour. Depending on the weight of the

train, it takes between one-half mile and one and one-half miles to stop a train traveling at full speed.

Locomotive engineers remain on-call to work 24 hours per day, with one assigned rest period per week. During Mashek's tenure, he often worked multiple shifts per day due to staffing shortages and he was regularly switched from daytime to nighttime shifts with as little as six hours to rest in between shifts. In May 2008, CP and the Brotherhood of Locomotive Engineers and Trainmen entered into a "work rest initiative" that placed limits on the amount of work that engineers could perform in any given month. In January 2009, CP made reductions to its workforce that required locomotive engineers to adapt to changes in their work and sleep cycles. Mashek testified that the changes required engineers to "work day and night for about 20 days, and then you were off for eight days adjusting to normal sleep cycles, and then back to the grind for another 20 days." In July 2009, the Rail Safety Improvement Act of 2008 ("RSIA") went into effect and mandated rest requirements for the rail industry. See 49 U.S.C. § 21101 (lengthening statutory rest periods for locomotive engineers).

### 3. Mashek's Seizure

On August 5, 2009, Mashek had a seizure approximately one hour after falling asleep. The seizure lasted approximately five minutes and was witnessed by his then-girlfriend. Mashek was unaware of any warning signs that preceded the seizure and he testified that he does not remember the seizure itself.

### 4. Mashek's Medical Evaluations and Return to Work Process

#### a. August 5, 2009 Medical Evaluation at Regina Medical Center

Immediately following the seizure, Mashek was transported by ambulance to the emergency room at Regina Medical Center. He was examined by Dr. Marven Ewen, and was informed that he could not drive until cleared by a neurologist. Mashek was referred to the Minnesota Epilepsy Group ("MEG") for an evaluation by a neurologist.

#### b. August 7, 2009 Medical Evaluation by the Minnesota Epilepsy Group

On August 7, 2009, Mashek was treated at the MEG by neurologist Dr. El-Hadi Mouderres. Dr. Mouderres performed an EEG test on Mashek and diagnosed him as having suffered a single generalized tonic-clonic (grand mal) seizure. Dr. Mouderres informed Mashek, a Wisconsin resident, that he could not drive for three months under Wisconsin law, and that since he "operates

locomotives for a living, he is advised to find a different position in his job that does not involve driving at this time." Dr. Mouderres also recommended that Mashek obtain an MRI at the St. Paul Radiology clinic as a follow-up test.

Mashek underwent a full brain MRI at the St. Paul Radiology clinic on August 11, 2009. The results of the MRI showed normal brain activity, except that "the left hippocampal complex may be slightly smaller than the right."

c. **August 2009 Communications Among CP, Mashek, and MEG**

On August 7, 2009, CP Health Services wrote to Mashek, informing him that he was on a medical leave of absence and asked him to provide a Fitness For Duty Report ("FFDR"). The letter also stated that "[i]n order to return to work, you must provide Health Services with a physician's statement indicating your diagnosis, treatment plan, medications, release to return to work and a list of restrictions if any."

On August 12, 2009, Mashek wrote to CP Health Services and asked to be returned to the locomotive engineer job. On August 13, 2009, CP sent Mashek a letter indicating that it received his medical information. The letter requested that Mashek provide an update on his condition within two weeks.

On August 17, 2009, Mashek had a second appointment with Dr. Mouderres at MEG for a CP-mandated "Fitness For Duty" evaluation. Dr. Mouderres completed the "Fitness For Duty" form, and stated that Mashek had a single generalized tonic-clonic seizure that was likely "triggered by" sleep deprivation. The doctor authorized a "full return to work without restrictions on 8-17-09" with the exception of "no driving until 3 months seizure-free" per Wisconsin state law, and advised that Mashek was "not to drive any commercial vehicles as a lifelong restriction." Mashek was also prescribed daily doses of Keppra, an anticonvulsant medication.

### d. October 2009 Return-To-Work Evaluation By MEG

On October 22, 2009, Mashek had a follow-up appointment with Dr. Deanna Dickens at MEG to determine his fitness for duty. Dr. Dickens' concluded that Mashek be placed on "accommodated duty" and restricted from "operating locomotive, or heavy, sharp machinery" until an "undetermined" date. MEG set a follow-up appointment for April 8, 2010.

### e. November 4-5, 2009 Medical Evaluation at the Mayo Clinic

Mashek contacted the Mayo Clinic in order to obtain a second opinion on his medical diagnosis and fitness for duty by an expert in the neurology field.

The Mayo Clinic scheduled Mashek for a two-day examination on November 4 and 5, 2009 with Dr. Terrence D. Lagerlund, a specialist in seizure conditions and neurology. Mashek informed Dr. Lagerlund that he was a locomotive engineer, but did not give him a description of the job duties and safety hazards, nor did he provide him with records from his treatment at MEG or inform him that MEG recommended that he not return to work as a locomotive engineer.

Dr. Lagerlund diagnosed Mashek as having a single generalized tonic-clonic seizure and recommended that Mashek take an anticonvulsant medication to prevent future seizures.

On November 5, 2009, Dr. Lagerlund completed a FFDR form, which indicated that Mashek could "return to work full duty (without restrictions)" as of November 9, 2009. At his deposition, Dr. Lagerlund testified that at the time he evaluated Mashek, he was comfortable releasing Mashek to work in a desk job capacity, but not as a locomotive engineer. Dr. Lagerlund testified that it would be reasonable to hold Mashek out of duty for an extended period as a precaution against having another seizure. It is Mashek's understanding that Dr. Lagerlund intended to authorize his return to the locomotive engineer position at that time. Mashek, however, did not confirm this understanding with Dr. Lagerlund.

After the November 2009 appointments, CP sent Mashek a letter acknowledging receipt of Dr. Lagerlund's FFDR, and requested that Mashek wait to submit an update until after April 8, 2010. Mashek wrote to CP's Chief Medical Officer ("CMO"), Dr. Daniel Janiga and reiterated his request to be returned to work as a locomotive engineer.

### 5. CP's Return-to-Work Policy

CP's Return-to-Work Policy requires clearance from CP Health Services for an employee to return to work "if they have been absent for any length of time" after experiencing, among other things, "blackouts, seizure disorders, loss of consciousness, [or] concussion." Dr. Janiga and/or Dr. Beth Baker, CP's Associate CMO, are responsible for determining when an employee is cleared to return to work.

Dr. Janiga concluded that Mashek should not return to the locomotive engineer position until one year after the seizure occurred as a precaution against reoccurrence. Dr. Janiga made this decision based on Mashek's medical records, and the Rail Association of Canada ("RAC") guidelines regarding the safety risks when employees in safety-sensitive positions experience a seizure. Dr. Janiga testified that the United States' railway industry has considered and continues to

consider adopting the RAC standards with regard to individuals who experience seizures. The RAC guidelines recommend that absent extenuating circumstances, individuals who have a single isolated seizure be removed from their safety-sensitive duties until they have been seizure-free for one year.

On November 16, 2009, Dr. Janiga informed Mashek of his decision. Dr. Janiga encouraged Mashek to apply for non-safety-sensitive positions at CP. In response, Mashek invoked Article 34 of the CBA, which provides for a neutral medical evaluation in the event that an engineer seeks to return to work after a medical leave of absence and there is a dispute about the employee's fitness for duty. Dr. Janiga declined to let Mashek undergo a neutral evaluation because he did not disagree with the condition diagnosed, and noted that all doctors agree on his condition, but that he would not clear him until he was seizure-free for one year, as required by RAC guidelines.

### 6. Search for Alternative Positions at CP

Mashek remained on involuntary and unpaid medical leave from August 5, 2009 through August 5, 2010. During this timeframe, Mashek communicated with CP's Human Resources and Staffing Services departments. On September 1, 2009, Mashek sent a letter to CP Health Services and stated he was interested

in returning to work as a locomotive engineer or "comparable work that does not jeopardize my seniority as an engineer." CP Health Services forwarded the letter to then-Employee Relations Advisor Terri Revell. Later in September 2009, Mashek and Revell had a telephone call and Revell said she would review open positions at CP to see whether there were any Mashek may want to apply for. On October 1, 2009, Revell wrote to Mashek and stated that she did not see any currently vacant jobs that Mashek could be reassigned to and encouraged him to continue checking CP's internal job posting site – US Jobs Online – for open positions. Revell offered to assist Mashek with his resume and online profile, and offered to assist him in accessing US Jobs Online. Mashek did not ask Revell for assistance.

Mashek applied for myriad positions at CP between October 2009 and June 2010. With the exception of one position, all of Mashek's applications were for management jobs, which would have represented promotions. Mashek admits that he lacked the minimum posted qualifications for many of the positions for which he applied, but applied anyway. Mashek also applied for several safety-sensitive positions, which would require him to operate trains and for which he was disqualified by virtue of his elevated risk of seizure. Mashek

met the minimum qualifications for some of the positions for which he applied, but it is undisputed that he was not the most qualified applicant.

During this one-year timeframe, CP allowed Mashek to continue on approved medical leave and he retained his engineer seniority. CP medically cleared Mashek to return to the locomotive engineer position beginning on August 5, 2010, and Mashek returned to work that day.

### 7. The EEOC Charge

On December 30, 2009, Mashek filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging that CP violated the Americans with Disabilities Act by refusing to allow his return to work based on application of discriminatory return to work policies and practices.

The EEOC interviewed Dr. Janiga and Terri Revell as part of its investigation. On October 28 2010, the EEOC issued a finding that:

> [T]here is reasonable cause to believe that the charging party was discriminated against in violation of the statute when he was denied reasonable accommodation. The record also supports that the respondent has discriminated against a class of employees through the practice of holding employees to Rail Association of Canada medical standards and in removing employees from positions based on a failure to meet these medical standards.

CP maintains that the EEOC's reasonable cause finding is legally incorrect because it determined that CP denied a reasonable accommodation based on a "perceived disability."

## B. Procedural Background

On February 28, 2011, Mashek filed a Complaint against CP in this Court. The Complaint alleges two counts of violations of the Americans With Disabilities Act Amendments Act of 2008 ("ADAAA"). The first count alleges unlawful disability discrimination in violation of Plaintiff's rights under the ADAAA, 42 U.S.C. §§ 12101, et seq. The second count alleges that CP failed to provide a reasonable accommodation in violation of the ADAAA, 42 U.S.C. §§ 12101, et seq.

CP now moves for summary judgment on both counts.

## III. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The party seeking

summary judgment bears the burden of showing that there is no disputed issue of material fact.  <u>Celotex</u>, 477 U.S. at 323.  Summary judgment is only appropriate when "there is no dispute of fact and where there exists only one conclusion." <u>Crawford v. Runyon</u>, 37 F.3d 1338, 1341 (8th Cir. 1994) (citation omitted).

### B. Merits of Discrimination Claim Based on Placement on Involuntary Medical Leave from Locomotive Engineer Position

#### 1. ADAAA Standard

The ADA protects "any qualified individual with a disability" from discrimination based on that disability.  <u>Phillip v. Ford Motor Co.</u>, 328 F.3d 1020, 1023 (8th Cir. 2002) (quoting 42 U.S.C. § 12112(a)).  The ADAAA was signed into law on September 25, 2008, and became effective on January 1, 2009.  Pub. L. No. 110-325.  Because the conduct allegedly giving rise to Mashek's claims occurred after that date, the amended version of the ADA applies.  See <u>Nyrop v. Indep. Sch. Dist. No. 11</u>, 616 F.3d 728, 734 n.4 (8th Cir. 2010).

The parties disagree as to whether Mashek's claims should be analyzed under the <u>McDonnell Douglas</u> burden shifting analysis.  <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).  Whether or not the <u>McDonnell Douglas</u> burden shifting analysis applies, Mashek must establish a prima facie case of discrimination.

14

The following three elements comprise a prima facie case of employment discrimination in this case: (1) that Mashek has a disability within the meaning of the ADAAA; (2) that he is qualified to perform the essential functions of his job, with or without reasonable accommodation; and, (3) that he suffered an adverse employment action because of his disability.  Dovenmuehler v. St. Cloud Hosp., 509 F.3d 435, 439 (8th Cir. 2007); Burchett v. Target Corp., 340 F.3d 510, 517 (8th Cir. 2003).

### 2.    Prima Facie Case

Although the parties disagree as to whether Mashek can establish the first and third elements of his prima facie case, the Court need not address these elements.  Mashek's discrimination claim fails because he cannot show that he was qualified for the locomotive engineer position during the relevant timeframe.

The second element of a prima facie case of discrimination requires the plaintiff to prove that she or he is qualified to perform the essential functions of the position, with or without reasonable accommodation.

> The determination of whether an employee is qualified to perform the essential functions of a job involves a two step inquiry.  First the employee must show that she meets the necessary prerequisites for the job, and then she must demonstrate that she can perform the

essential functions, with or without reasonable accommodation.  If the employee establishes that she cannot perform the essential functions of the job without accommodation, she must also make a facial showing that reasonable accommodation is possible and that the accommodation will allow her to perform the essential functions of the job.

Burchett v. Target Corp., 340 F.3d 510, 517 (8th Cir. 2003) (citations omitted).

Essential functions are "fundamental job duties of the employment position the individual with a disability holds or desires."  29 C.F.R. §1630.2(n)(1).  Evidence of whether a particular function is essential includes:  the employer's opinion as to which functions are essential, written job descriptions, amount of time spent on the job performing the function, consequences of not requiring the employee to perform the function, terms of a collective bargaining agreement, work experience of employees who previously held the job, and/or current work experience.  29 C.F.R. §1630.2(n)(3).

An employer's judgment regarding the essential functions of its job is considered "highly probative."  Alexander v. Northland Inn, 321 F.3d 723, 727 (8th Cir. 2003).  Additionally, an employer is not required to reallocate the essential functions of a job to other employees or to exempt an employee from the required essential task because "an accommodation that would cause other employees to work harder, longer, or be deprived of opportunities is not

mandated." Rehrs v. The Iams Co., 486 F.3d 353, 357 (8th Cir. 2007) (citation omitted).

CP and Mashek agree that locomotive engineers are responsible for the safe operation of trains. Both parties also agree that a locomotive engineer must remain alert at all times in order to safely operate a train. CP's job description for the locomotive engineer position states that engineers must have the "ability to remain mentally alert and aware of surroundings." Mashek agrees that he was in no condition to operate a train during his seizure, and he does not contest that there could be consequences if he had a seizure or became incapacitated while operating the train.

Mashek cannot show that he was qualified for the locomotive position during the relevant timeframe. It is undisputed that Mashek's risk of recurrent seizure during the first year after his seizure was significantly higher than the general population. Based on the medical information that Mashek provided CP, Dr. Janiga concluded that a one-year break from operating a train was a necessary safety precaution against a recurrent seizure. All of the doctors involved in this case – Dr. Janiga, Dr. Baker, Dr. Lagerlund, and Dr. Hartenbaum – agree that this was a reasonable decision. Plaintiff presents no medical

evidence that he could operate a locomotive during the relevant timeframe. Although Mashek believed that Dr. Lagerlund authorized him to return to work as a locomotive engineer, Dr. Lagerlund testified that he released Mashek to work in a desk job capacity and that it was reasonable to hold Mashek out of duty as a locomotive engineer for an extended period of time. Additionally, Mashek has not identified an accommodation that would allow him to perform the essential functions of the locomotive engineer position. CP is thus entitled to summary judgment on this claim.

### C.     Merits of Discrimination Claim Based on Failure to Accommodate

#### 1.     Reasonable Accommodation Process Standard

An employer engages in discrimination under the ADA by:

> not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such [employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such [employer].

42 U.S.C. § 12112(b)(5)(A).

> Where the employee requests accommodation, the employer must engage in an 'informal, interactive process' with the employee to identify the limitations caused by the disability and the potential reasonable accommodations to overcome those limitations. An employer hinders this process when: the employer knows about the employee's disability; the employee requests accommodations or

assistance; the employer does not in good faith assist the employee in seeking accommodations; and the employee could have been reasonably accommodated but for the employer's lack of good faith.

Battle v. United Parcel Serv., Inc., 438 F.3d 856, 862-63 (8th Cir. 2006) (citations omitted).

## 2.    Discussion

CP argues that it is entitled to summary judgment as to Mashek's failure to accommodate claim because, assuming for purposes of the motion that Mashek was disabled during the relevant time period, CP fully accommodated Mashek and acted in good faith.

The Court finds that the record supports CP's position and that no genuine issues of material fact would prevent judgment in favor of CP as to Mashek's claim of failure to accommodate under the ADAAA.  CP reasonably accommodated Mashek by providing him with a one-year medical leave and ensuring that he would retain his engineer seniority.  CP also accommodated Mashek when CP's Employee Relations Advisor searched for other positions for which Mashek might be qualified, directed him to the US Jobs Online listing of vacancies, offered to help him access the US Jobs Online system, and offered to help him fill in his resume and profile on the system.

Mashek repeatedly told CP that he would not accept a transfer to a position that would jeopardize his engineer seniority. The record establishes that this restriction eliminated most other available union jobs at CP and therefore, Mashek's options were quite limited. Mashek was not able to point to a vacancy, other than those he applied for, that he should have been awarded as an accommodation. In regard to the positions that Mashek applied for, the record establishes that he either lacked the minimum qualifications for the position, or was not the most qualified applicant, or the position was a safety-sensitive position, or the position would have resulted in a promotion that would have jeopardized his engineer seniority.

Mashek has not presented any evidence that CP failed to act in good faith, or that there is a material question of fact about whether he could have been accommodated but for any alleged bad faith. It was Mashek's burden to show that genuine issues of fact exist that other reasonable accommodations existed and that CP acted in bad faith during the interactive process required to address his requests for accommodation. Mashek did not meet this burden, and CP is thus entitled to summary judgment on this claim.

Accordingly, based upon the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED**:

Defendant's Motion for Summary Judgment [Docket No. 42] is **GRANTED** and this matter is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated:   December 14, 2012              s/ Michael J. Davis
                                        _____

                                        Michael J. Davis
                                        Chief Judge
                                        United States District Court